**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Dollar Bank, FSB v. Harris*, **Slip Opinion No. 2026-Ohio-3069.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-3069

DOLLAR BANK, FSB, APPELLANT, *v.* HARRIS, TAX COMMR., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Dollar Bank, FSB v. Harris*, Slip Opinion No. 2026-Ohio-3069.]**

*Taxation—Financial-institutions tax—R.C. Ch. 5726—Dormant Commerce Clause of United States Constitution—Board of Tax Appeals correctly affirmed tax commissioner's denial of bank's request for tax refund—Ohio's financial-institutions tax is internally consistent and therefore does not unfairly discriminate against interstate commerce—Board of Tax Appeals' decision affirmed.*

(No. 2025-0412—Submitted February 10, 2026—Decided August 13, 2026.)

APPEAL from the Board of Tax Appeals, No. 2022-1361.

_____

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ., joined.

**DEWINE, J.**

{¶ 1} Ohio taxes banks by way of a regressive-rate structure. The upshot of this scheme is that the more business a bank does in Ohio, the lower its effective tax rate. This case presents the question of whether this method of taxation is unconstitutional under the "dormant" aspect of the federal Constitution's Commerce Clause.

{¶ 2} Dollar Bank, FSB, does most of its business in Pennsylvania, but it also has branches in Ohio. It doesn't much like Ohio's scheme for taxing banks. Its complaint is that because Ohio adjusts tax rates downward based on how much business a bank does in the State, it is forced to pay more in taxes than a similarly sized bank that operates exclusively in Ohio. This, Dollar Bank says, is illegal discrimination against interstate commerce in violation of the United States Constitution.

{¶ 3} Claiming that Ohio's tax scheme is unconstitutional, Dollar Bank asked the State of Ohio to refund some of the taxes that it had paid. The tax commissioner denied the refund request and the Board of Tax Appeals ("BTA") affirmed that decision on appeal. Because we find no constitutional problem with Ohio's tax scheme, we affirm the decision of the BTA.

## I. BACKGROUND

{¶ 4} Dollar Bank is a chartered federal savings bank that is headquartered in Pittsburgh, Pennsylvania. Dollar Bank has about 70 branches, with locations in Pennsylvania, Ohio, Virginia, and Maryland. About 30 branches are in Ohio.

{¶ 5} Banking is a competitive industry, with consumers shopping for the best rates on loans and deposits. So naturally, Dollar Bank tries to keep its expenses down, including its tax bill. States also compete for banks, seeking to encourage financial institutions to conduct business in their respective state. To compete for business, Ohio created its financial-institutions tax (the "FIT"), and structures it in a particular way.

## A. The FIT

{¶ 6} Ohio levies the FIT on banks and other financial institutions "for the privilege of doing business in this state." R.C. 5726.02(A). A bank initially needs two numeric components to compute what it owes under the FIT. First, the bank must determine its "total equity capital." R.C. 5726.01(S). Total equity capital is calculated based on the equity holdings of a financial institution, including stocks and retained earnings. *Id.* Second, the bank must determine its "apportionment factor." R.C. 5726.05(A). The apportionment factor is the percentage of a bank's total gross receipts from activities in Ohio as compared to the bank's total gross receipts from all locations during that year. R.C. 5726.05(B). The bank's "total Ohio equity capital" is then determined by "multipl[ying]" its total equity capital by its apportionment factor. R.C. 5726.04(C)(1). So a bank with $500 million in total equity capital that generated 10 percent of its gross receipts in Ohio would have an Ohio equity capital of $50 million.

{¶ 7} The last relevant calculation requires determining the amount of tax the bank owes. While most income taxes tend to feature a progressive-rate structure, whereby "higher incomes are taxed at a higher rate," *Black's Law Dictionary* (12th Ed. 2024) (defining "progressive tax"), the FIT features a three-tiered, regressive-rate structure, whereby the tax rate decreases as a bank's total Ohio equity capital increases, *see id.* (defining "regressive tax"). The first $200 million of a bank's Ohio equity capital is taxed at 0.8 percent, equity capital between $200 million and $1.3 billion is taxed at 0.4 percent, and equity capital above $1.3 billion is taxed at 0.25 percent. R.C. 5726.04(A)(1)(b). This regressive-rate structure incentivizes banks to conduct more business in Ohio.

## B. The Proceedings Below

{¶ 8} Dollar Bank filed refund claims with the tax commissioner for tax years 2016 through 2020, contending the FIT was unconstitutional in its application. *See* R.C. 5726.30(A) (authorizing FIT refunds). Although it initially

sought higher amounts, Dollar Bank later amended its request to seek a refund of between $461,732 and $640,158 for each tax year.

{¶ 9} The tax commissioner denied the request, explaining that the tax commissioner does not have the authority to determine the constitutionality of the FIT. *See State ex rel. Kingsley v. State Emp. Relations Bd.*, 2011-Ohio-5519, ¶ 18, quoting *State ex rel. Columbus S. Power Co., v. Sheward*, 63 Ohio St.3d 78, 81 (1992) ("'it is settled that an administrative agency is without jurisdiction to determine the constitutional validity of a statute'").

{¶ 10} Dollar Bank then appealed to the BTA. The BTA declined to consider the constitutionality of the FIT and affirmed the tax commissioner's denial of Dollar Bank's refund request. *See Cleveland Gear Co. v. Limbach*, 35 Ohio St.3d 229 (1988), paragraph one of the syllabus ("The Board of Tax Appeals is an administrative agency, a creature of statute, and is without jurisdiction to determine the constitutional validity of a statute."). This appeal followed.

## II. ANALYSIS

{¶ 11} Because Dollar Bank attacks the constitutionality of the FIT, it "must overcome the presumption that the statute is constitutional." *VVF Intervest, L.L.C. v. Harris*, 2025-Ohio-5680, ¶ 41. It is "only when . . . clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it." *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.*, 1 Ohio St. 77, 82-83 (1852).

### A. The (Dormant) Commerce Clause

{¶ 12} Dollar Bank's primary argument is that the FIT as applied to Dollar Bank violates the dormant Commerce Clause. The Commerce Clause vests in Congress the power to "regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. Although the clause's text speaks solely to the regulatory authority of Congress, the United States Supreme Court has held that "the Clause also 'contain[s] a further, negative command,' one effectively forbidding the

4

enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" (Bracketed text in original.) *Natl. Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023), quoting *Oklahoma Tax Comm. v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). The core principle of this negative or "dormant" command is antidiscrimination. *Id.* at 369, citing *Camps Newfound/Owatonna, Inc. v. Harrison*, 520 U.S. 564, 581 (1997). The dormant Commerce Clause is not without its "vigorous and thoughtful critiques," *Tennessee Wine & Spirits Retailers Assn. v. Thomas*, 588 U.S. 504, 515 (2019). *See, e.g.*, *Camps Newfound/Owatonna* at 610 (Thomas, J., dissenting) ("The negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application."). But regardless of the validity of these critiques, "[w]e are bound to follow the holdings of the high court on issues of federal constitutional law," *State v. Carter*, 2024-Ohio-1247, ¶ 35.

### B. The Internal-Consistency Test

{¶ 13} Dollar Bank's first proposition of law asserts that "the FIT as applied to Dollar Bank violates the Commerce Clause of the United States Constitution because it fails the internal consistency test."

{¶ 14} Taxes, like other economic regulations, may be subject to scrutiny under the dormant Commerce Clause. *See, e.g.*, *Armco, Inc. v. Hardesty*, 467 U.S. 638, 642 (1984); *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 278-279 (1977). And here, the United States Supreme Court has given us a four-part test: a state tax will pass constitutional muster if it is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto* at 279.

{¶ 15} Dollar Bank's argument centers on the fair-apportionment requirement of the *Complete Auto* test. The "central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of

an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 260-261 (1989). This fair-share principle is the "lineal descendant" of the prohibition against multiple taxation. *Jefferson Lines*, 514 U.S. at 184.

{¶ 16} In arguing the FIT violates the fair-apportionment requirement, Dollar Bank relies on the "internal consistency" test, a test that the United States Supreme Court has developed to "help[] courts identify tax schemes that discriminate against interstate commerce." *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 562 (2015). The test "'looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate.'" *Id.*, quoting *Jefferson Lines* at 185. The resulting apportionment formula "must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 169 (1983). The test "asks nothing about the degree of economic reality reflected by the tax," but simply examines its structure. *Jefferson Lines* at 185.

{¶ 17} The test "allows courts to distinguish between (1) tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States, and (2) tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes." *Wynne* at 562, citing *Armco*, 467 U.S. at 645-646, and *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 277, fn. 12 (1978). Thus, the primary concern of the internal-consistency test is rooting out state policies that either discriminate against interstate commerce or result in double taxation. *Id.*; *see Armco* at 644 ("A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce."). When a tax fails the internal-consistency test, it "shows as a matter of law that a State is attempting to take more

than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax." *Jefferson Lines* at 185.

## C. The FIT Is Internally Consistent

{¶ 18} The FIT does not discriminate against interstate commerce, nor does it engage in double taxation. *See Wynne* at 561-562. In reaching this determination, we begin by "'look[ing] to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate.'" *Id.* at 562, quoting *Jefferson Lines*, 514 U.S. at 185.

{¶ 19} The FIT does not result in double taxation because it is structured to allow Ohio to tax only the portion of a bank's equity capital that is attributable to its business in Ohio. Recall the way the formula works. The apportionment factor measures the percentage of a bank's business that is conducted in Ohio. And that factor is applied to the bank's total equity capital to arrive at the Ohio equity capital that is subject to the tax. So, if every state applied the FIT, each state would tax only the discrete portion of equity capital that is attributable to the bank's business in that state. No part of a bank's equity capital would be taxed by more than one state.

{¶ 20} Table 5 from Dollar Bank's own merit brief proves this point. This table, based on Dollar Bank's total equity capital and business activities for tax year 2017, shows what Dollar Bank would pay under the FIT to each state it does business in if each state were to adopt a tax identical to the FIT:

Table 5

| | Ohio | | Pennsylvania | | Other States | |
|---|---|---|---|---|---|---|
| | Equity Computation | Tax Computation | Equity Computation | Tax Computation | Equity Computation | Tax Computation |
| Total Equity Capital | $853,794,000 | | $853,794,000 | | $853,794,000 | |
| In-State Apportionment | 19.4431% | | 74.2249% | | 6.3320% | |
| In-State Equity Capital | $166,004,021 | | $633,727,652 | | $54,061,903 | |
| In-State Equity Taxed at 0.8% | $166,004,021 | $1,328,032 | $200,000,000 | $1,600,000 | $54,061,903 | $432,495 |
| In-State Equity Taxed at 0.4% | $0 | $0 | $433,727,652 | $1,734,911 | $0 | $0 |
| Total Tax Due | | $1,328,032 | | $3,334,911 | | $432,495 |

Total Tax Due Everywhere (PA + OH + Other States)    $5,095,438

The left column shows payments to Ohio, the middle column shows payments to Pennsylvania, and the right column shows payments to all other states. The table shows that Dollar Bank had an Ohio apportionment factor of 19.4431 percent, a Pennsylvania apportionment factor of 74.2249 percent, and an other-states apportionment factor of 6.3320 percent. These three percentages add up to 100 percent, as they must under the internal-consistency test. *See Container Corp.*, 463 U.S. at 169 ("the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed"). Thus, under Dollar Bank's own example, no state Dollar Bank operates in would be taxing anything other than its own share of Dollar Bank's total equity capital.

{¶ 21} Not only is there no double taxation, but the FIT is also not discriminatory. The FIT operates evenhandedly across its entire structure, irrespective of the taxpayer's status as an interstate or intrastate business. *See Wynne*, 575 U.S. at 562. The amount of taxes owed under the FIT is solely a function of the amount of a bank's total Ohio equity capital, regardless of whether a bank operates in interstate commerce. An in-state or out-of-state bank with the same amount of total Ohio equity capital pays the same Ohio tax rates.

{¶ 22} Under the internal-consistency test, because each state is taxing only the portion of equity capital apportioned to that state, there is no risk of double taxation using the FIT. *See Jefferson Lines*, 514 U.S. at 184 ("multiple

taxation . . . is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed"); *see also Cooper Tire & Rubber Co. v. Limbach*, 1994-Ohio-122, ¶ 17 ("As to the internally consistent claim, we conclude that if every state required taxpayers to include mobile property sitused in their state in the numerator of the property fraction, as Ohio does, the property would only be included in one state's numerator. Thus, no multiple taxation would result."). And because the FIT applies evenhandedly to intrastate and interstate banks, there is no unfair discrimination. *See Wynne* at 562; *Armco*, 467 U.S. at 644-646.

### D. Dollar Bank Misconstrues the Internal-Consistency Test

{¶ 23} Perhaps recognizing that application of the FIT does not result in discrimination or double taxation, Dollar Bank attempts to rephrase the internal-consistency test as instead asking: "If every state enacted a tax identical to the tax at issue, would a person doing business in multiple states pay more, *in the aggregate*, than a person conducting the same business entirely within a single state?" (Emphasis added.) It argues that because it would pay a lower effective tax rate if all its business was concentrated in Ohio, the FIT discriminates against interstate commerce.

{¶ 24} The problem is that the United States Supreme Court has never adopted Dollar Bank's aggregation approach. Dollar Bank looks primarily for support in two United States Supreme Court decisions, *Armco*, 467 U.S. 638, and *Wynne*, 575 U.S. 542, but neither case helps its cause. *Armco* involved a West Virginia tax scheme that imposed a 0.27 percent gross-receipts tax on businesses selling tangible property at wholesale and a state manufacturing tax of 0.88 percent for products manufactured within West Virginia. In-state manufacturers, however, were exempt from the gross-receipts tax.

{¶ 25} The Court found the tangible-property tax was not internally consistent because it facially discriminated against out-of-state businesses. The

Court explained that "[t]he tax provides that two companies selling tangible property at wholesale in West Virginia will be treated differently depending on whether the taxpayer conducts manufacturing in the State or out of it." *Armco* at 642. To illustrate the tax's lack of internal consistency, the Court hypothesized that "if Ohio were to adopt the precise scheme here, then an interstate seller would pay the manufacturing tax of 0.88% and the gross-receipts tax of 0.27%; a purely intrastate seller would pay only the manufacturing tax of 0.88% and would be exempt from the gross receipts tax." *Id.* at 644. Thus, "when the two taxes are considered together, discrimination against interstate commerce persists" due to the in-state exemption. *Id.*

{¶ 26} Dollar Bank claims the court found the tax to not be internally consistent because the interstate business "would pay more tax, in the aggregate among multiple states, than the wholly in-state company." But that's not what the Court said. Rather, the problem with the West Virginia tax scheme was that it discriminated against out-of-state businesses by subjecting them to a tax that in-state businesses were not required to pay. *Id.* at 644.

{¶ 27} In contrast, Ohio's FIT does not discriminate against banks based on whether they are engaged in interstate commerce. Two banks with the same Ohio equity capital will pay the same tax, regardless of whether they are an interstate or intrastate bank. And if every state adopted Ohio's scheme, any bank with the same economic footprint and the same equity capital would pay the same tax.

{¶ 28} *Wynne* doesn't help Dollar Bank either. That case involved Maryland's income-tax scheme, which included a "'state'" and a "'county'" income tax, both of which were collected by the State. 575 U.S. at 545-546. For income taxes paid to another state for income earned outside Maryland, Maryland offered its residents a credit against the "state" tax but not the "county" tax. *Id*. at 546. The result was that "part of the income that a Maryland resident earn[ed]

outside the State" was subject to taxation in both Maryland and in the state in which it was earned. *Id.*

{¶ 29} To show that Maryland's regime lacked internal consistency, the Supreme Court provided an example of what would happen if every state were to adopt a tax scheme like Maryland's:

> April and Bob both live in State A, but . . . April earns her income in State A whereas Bob earns his income in State B. In this circumstance, Bob will pay more income tax than April solely because he earns income interstate. Specifically, April will have to pay a 1.25% tax only once, to State A. But Bob will have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income.

*Id.* at 565. Contrary to what Dollar Bank suggests, the Court did not find that the scheme violated the internal-consistency test solely because Bob—the interstate earner—was paying more in taxes. Rather, the problem was that Bob would "pay a 1.25% tax *twice*" on the same income. (Emphasis added.) *Id.* The test thus showed that Maryland's regime was "inherently discriminatory and operate[d] like a tariff," the "'paradigmatic example of a law discriminating against interstate commerce.'" *Id.*, quoting *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994).

{¶ 30} The FIT is nothing like the tax scheme found unconstitutional in *Wynne*. The FIT applies only to a bank's *Ohio* share of equity capital. And if every state adopted the same regime, no dollar of a bank's equity capital would be taxed more than once. *See, e.g.*, *Jefferson Lines*, 514 U.S. at 185 ("If every State were to impose a tax identical to Oklahoma's, that is, a tax on ticket sales within the State for travel originating there, no sale would be subject to more than one State's tax.").

{¶ 31} Dollar Bank complains that because it conducts business in several states, the FIT's regressive-rate structure means that it pays more in taxes than if it consolidated all its business in Ohio. Table 6 from its merit brief illustrates this objection by showing what Dollar Bank would have paid for tax year 2017 if it had concentrated all its operations in Ohio:

Table 6

|  | Ohio | |
|  | Equity Computation | Tax Computation |
| --- | --- | --- |
| Total Equity Capital | $853,794,000 | |
| In-State Apportionment | 100.0000% | |
| In-State Equity Capital | $853,794,000 | |
| In-State Equity Taxed at 0.8% | $200,000,000 | $1,600,000 |
| In-State Equity Taxed at 0.4% | $653,794,000 | $2,615,176 |
| Total Tax Due | | $4,215,176 |

Comparing the computations in Tables 5 and 6, Dollar Bank deduces that because it paid more as an interstate business ($5,095,438) than it would have paid as an intrastate business operating exclusively in Ohio ($4,215,176), the FIT fails the internal-consistency test.

{¶ 32} While its calculations are correct, the legal conclusions Dollar Bank draws from them are not. The disparity exists simply because Ohio chooses to impose a regressive tax that incentivizes banks to increase their Ohio equity capital, not because of any discrimination against interstate commerce. Consider a scenario in which every state adopted the FIT and two banks have the same amount of total equity capital (let's say $500 million). One bank operates exclusively in Ohio; the other bank evenly divides its operations between two states. The Ohio bank would pay a lower effective tax rate than the multistate bank because more of its total

12

equity capital is being taxed at the lower 0.4 percent rate.[1]  But while the multistate bank is paying a higher effective tax rate, none of its equity capital is being taxed twice—unlike in *Wynne*—nor is the higher rate the result of a discriminatory interstate element—unlike the in-state exemption in *Armco*.  The multistate bank is paying more in taxes simply because it doesn't conduct much business in a single state.

{¶ 33} Now imagine a hypothetical bank located only in Ohio that has $400 million in Ohio equity capital and a multistate bank that has $1500 million in equity capital that is evenly divided among three states.  In a scenario in which every state adopts the FIT, it is the Ohio bank that will pay a higher effective Ohio tax rate.[2]  The difference again, though, is not due to any discrimination against in-state banks any more than the difference in the previous example was due to discrimination against out-of-state banks.  Ohio's tax scheme simply favors banks that do more business in Ohio.

{¶ 34} Indeed, the United States Supreme Court has never employed the internal-consistency test in the manner that Dollar Bank proposes.  On the contrary, the Supreme Court has explicitly upheld a tax scheme resulting in higher aggregate taxes under the internal-consistency test.  In *Am. Trucking Assns., Inc. v. Michigan Pub. Serv. Comm.*, the court analyzed a Michigan tax that imposed a flat $100 vehicle tax solely on trucks that undertook point-to-point hauls between Michigan

---

1.  The effective tax rate equals total tax divided by total equity capital.  Here, the Ohio bank pays 0.8 percent on its first $200 million ($1.6 million) and 0.4 percent on the remaining $300 million ($1.2 million), yielding a 0.56 percent effective rate on $500 million in capital ($2.8 million in total tax).  Conversely, the multistate bank pays 0.8 percent on its first $200 million ($1.6 million) and 0.4 percent on its remaining $50 million ($200,000), yielding a 0.72 percent effective rate on $250 million in capital ($1.8 million in total tax).

2.  Calculated identically to the previous example: the Ohio bank pays 0.8 percent on its first $200 million ($1.6 million) and 0.4 percent on the remaining $200 million ($800,000), yielding a 0.6 percent effective rate on $400 million in capital ($2.4 million in total tax).  The multistate bank has $500 million in Ohio equity capital, yielding the same 0.56 percent effective rate as the Ohio bank in the previous example ($1.6 million on the first $200 million + $1.2 million on the remaining $300 million = $2.8 million in total tax).

cities. *See* 545 U.S. 429, 431 (2005). A group of interstate-trucking companies argued that the tax failed the internal-consistency test because a company operating interstate that also made point-to-point hauls within a single state would have to pay the fee to multiple states while a purely intrastate company would pay the fee only once. The Court rejected the challenge, explaining that while the interstate company would pay higher fees, it "would have to do so only because it engages in *local* business in all those States." (Emphasis in original.) *Id.* at 438. "An interstate firm with local outlets normally expects to pay local fees that are uniformly assessed upon all those who engage in local business, interstate and domestic firms alike." *Id.*

{¶ 35} To accept Dollar Bank's argument would require us to conclude that the Commerce Clause forbids all regressive tax structures. After all, any regressive state-tax structure has the potential to tax similarly sized businesses more if they spread their activities around various states than if they concentrate their activities in a single state. But there is no United States Supreme Court precedent that would support such a surprising conclusion. Rather, the Supreme Court has "'long held that the Constitution imposes no single [apportionment] formula on the States'" (bracketed text in original), *Goldberg*, 488 U.S. at 261, quoting *Container Corp.*, 463 U.S. at 164, and has afforded states "broad discretion to configure their systems of taxation as they deem appropriate," *Oregon Waste Sys., Inc. v. Dept. of Environmental Quality*, 511 U.S. 93, 108 (1994), thus "declin[ing] to undertake the essentially legislative task of establishing a 'single constitutionally mandated method of taxation,'" *Goldberg* at 261, quoting *Container Corp.* at 171.

{¶ 36} Indeed, as the tax commissioner points out, the FIT's rate structure can be understood as reflecting the legislative task to create a tax policy that incentivizes financial institutions to do business in Ohio. Under Supreme Court precedent, Ohio is free to pursue such a policy because the Commerce Clause does not erect a per se barrier against a state's adoption of tax policies that seek to

achieve "fair encouragement of in-state business." *Armco*, 467 U.S. at 645. Nor does it forbid a state's attempt to "compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy." *Boston Stock Exchange v. State Tax Comm.*, 429 U.S. 318, 336-337 (1977).

{¶ 37} Because Dollar Bank has failed to demonstrate "clear incompatibility" between Ohio's tax scheme and the constitution, *Cincinnati, Wilmington & Zanesville RR. Co.*, 1 Ohio St. at 82-83, we reject its arguments that the FIT violates the dormant Commerce Clause.

### E. Dollar Bank's Remaining Propositions of Law

{¶ 38} In addition to its dormant Commerce Clause argument, Dollar Bank raises two other propositions of law. In its second proposition, it asks us to "cure the internal consistency failure" of the FIT by altering its apportionment method so as to allow Dollar Bank's tax tier to be determined without regard to Dollar Bank's location. But, of course, we have no authority to rewrite statutes. And because we find there is no internal-consistency failure to be cured, there is no reason to consider Dollar Bank's request.

{¶ 39} Dollar Bank next tersely claims that the FIT is unconstitutional under the Due Process Clause of the United States Constitution. We summarily reject the argument because it does no more than repackage Dollar Bank's Commerce Clause challenge—which we have already rejected—as a Due Process Clause challenge.

### III. CONCLUSION

{¶ 40} Dollar Bank has failed to show that the FIT is unconstitutional. We accordingly affirm the Board of Tax Appeals' decision upholding the tax commissioner's denial of Dollar Bank's refund request.

Decision affirmed.

_____

Reed Smith, L.L.P., Paul E. Melniczak, Kyle O. Sollie, and Michael I. Lurie, for appellant.

D. Andrew Wilson, Attorney General, and Daniel Fausey, Assistant Attorney General; and Organ Law, L.L.P., Kirsten R. Fraser, and Lindsey M. Woods, for appellee.

_____